IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 15, 2021

## STATE OF TENNESSEE v. JEFFREY LEE POTTS

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-114     Jennifer L. Smith, Judge**

_____

### No. M2020-01623-CCA-R3-CD

_____

The Defendant, Jeffrey Lee Potts, appeals his jury conviction for attempted second-degree murder, for which he received a Range I sentence of twelve years' incarceration. In this direct appeal, the Defendant alleges that (1) the evidence was insufficient to support his conviction; (2) the trial court erred by prohibiting the defense expert from testifying about the reasoning and science upon which he based his opinion of the Defendant's mental condition at the time of shooting; (3) the trial court erred by denying the Defendant's motion for a mistrial after the trial court stated in the jury's presence that defense counsel could "rehabilitate" and "clean up" the expert's testimony; and (4) the trial court erred in sentencing the Defendant, both in imposing the maximum sentence, as well as in imposing a sentence of continuous confinement. Following our review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Martesha L. Johnson, District Public Defender; and Jeffrey A. DeVasher (on appeal), Jonathan F. Wing (at trial), and Crandall Story (at trial), Assistant District Public Defenders, for the appellant, Jeffrey Lee Potts.

Herbert H. Slatery III, Attorney General and Reporter; Richard Davison Douglas, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and D. Paul DeWitt and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

This case stems from an incident that occurred on August 14, 2016, at the townhouse of Jennifer Burnett. The Defendant had been having an affair with Ms. Burnett for several

months, and he had been staying at the townhome while Ms. Burnett and her husband, Michael Thomson ("the victim"), were away on a trip. When the victim and Ms. Burnett returned to the townhome from their trip, the Defendant immediately opened fire on the victim from the second-floor landing, shooting the victim five times. Thereafter, on February 3, 2017, the Davidson County grand jury indicted the Defendant for attempted first-degree premediated murder, a Class A felony. See Tenn. Code Ann. §§ 39-12-101, -13-210. He proceeded to a jury trial where the following proof was adduced.

A. Trial. The victim testified that he and Ms. Burnett married in December 2013 and that they were married for close to three years. After they married, Ms. Burnett and her daughter Rebecca[1] moved into the victim's house on Five Oaks Boulevard in Lebanon. In addition, Ms. Burnett owned a townhouse on Rossi Road in Davidson County, which she began renting out. The victim testified that he and Ms. Burnett owned multiple rental properties together and that Ms. Burnett managed those properties.

In June 2016, the victim became aware that Ms. Burnett had hired the Defendant to do maintenance work at their properties. The victim had previously met the Defendant in November 2015, when the Defendant purchased a vehicle from the victim and Ms. Burnett that had been advertised on Craigslist. The victim later learned that the Defendant and Ms. Burnett had been having an affair from March 2016 to August 2016.

The victim and Ms. Burnett were experiencing marital difficulties throughout 2016, and the victim had filed for divorce in the spring of 2016. On July 19, 2016, the couple officially separated after Ms. Burnett obtained a temporary order of protection against the victim. The victim acknowledged that several violent incidents had occurred between himself and Ms. Burnett and that Ms. Burnett had included these allegations of domestic abuse in her petition for an order of protection. The victim admitted chipping two of Ms. Burnett's front teeth during an altercation while he was driving, but he claimed that his "large ring" caused Ms. Burnett's injury as she was attacking him and he pushed her away. He also admitted pushing Ms. Burnett out of a doorway during another altercation; though he asserted that she had pointed a gun at him, the police arrested him as the primary aggressor. Initially, the victim had asked the Defendant to be a witness for him when Ms. Burnett obtained the order of protection against him.

After being shown some photographs of Ms. Burnett bleeding, the victim denied inflicting the injuries to Ms. Burnett that were depicted therein. The victim explained that the only time he had caused Ms. Burnett to bleed was when they were "horsing around" at a Tennessee Titans game and Ms. Burnett "got hit on the head by actually the same ring,

---

[1] Because Rebecca shares a surname with her mother, we will refer to Rebecca by her first name. In doing so, we intend no disrespect.

and it caused a little mark on her head there." He blamed the football game incident on mutually excessive drinking.

In addition, the order of protection required the victim to leave his residence in Lebanon, so the victim moved in with a friend. Previously, the victim had purchased two Glock handguns in September 2015—one for himself and one for Ms. Burnett. When Ms. Burnett obtained the order of protection, the victim was ordered not to possess a weapon, so he locked the handguns, along with a rifle he owned, in a safe at the Lebanon residence before he left. To the best of the victim's knowledge, Ms. Burnett's handgun was in the safe when he left the home in July 2016.

The victim testified that he first started to suspect that Ms. Burnett and the Defendant were having an affair on July 19, 2016, the same date that the court granted Ms. Burnett the temporary order of protection. According to the victim, he saw Ms. Burnett and the Defendant in a parking lot, and they appeared to be kissing. The victim said that the Defendant later called him to assure him that he was not having an affair with Ms. Burnett and that he and Ms. Burnett were just friends. The victim returned to the Lebanon residence that evening and was arrested for violating the order of protection.

The victim acknowledged that after seeing the Defendant and Ms. Burnett kissing in the parking lot, he attempted to track Ms. Burnett's movements. Further, the victim did not deny that he told Rebecca that he had wanted to kill the Defendant after seeing the apparent kiss. The victim admitted that he tampered with the car Ms. Burnett was driving by disconnecting cables and removing fuses. He told Ms. Burnett the engine could blow up if she drove the car. The victim also admitted sending a photograph to Ms. Burnett and Rebecca on July 19 depicting clothing he had thrown in the hallway and texting, "Just helping you move."

On July 29, the victim falsely told the Defendant that he had installed a tracker on Ms. Burnett's car because he wanted to manipulate the Defendant to inform Ms. Burnett about the tracker. He also falsely indicated to Rebecca that he had hired a private investigator so she would tell Ms. Burnett. The victim had also asked the Defendant to inform him of Ms. Burnett's whereabouts before he knew of the affair.

On August 4, 2016,[2] the order of protection was dismissed; Ms. Burnett was given ten days to move out of the victim's Lebanon residence; and the victim was allowed to return to his home. Ms. Burnett immediately began moving her belongings to her townhouse on Rossi Road. The Defendant assisted Ms. Burnett with the move. According to the victim, while Ms. Burnett was moving out, he accidentally picked up the Defendant's

---

[2] There was varying testimony from the victim whether this occurred on August 3 or 4. Most witnesses consistently referred to August 4.

cell phone believing that the phone belonged to him. The victim then saw text messages "on top of the phone" between the Defendant and Ms. Burnett indicating that they were having an affair. The victim said that he was "upset" about the affair but clarified that he was not "extremely" upset or "[e]rratic." In addition, the victim confirmed that upon returning to his Lebanon home, he retrieved his Glock handgun from the safe; he could not recall if the other Glock handgun was still in the safe.

On August 8, the victim texted Ms. Burnett that he was hurting and constantly crying. The next day the two met in the parking lot of a Kroger near Ms. Burnett's townhouse. The victim testified that Ms. Burnett did not want him to come to her townhouse and wanted their meeting to occur in a public place. The victim knew that by this time, Ms. Burnett was allowing the Defendant to stay at the townhouse. The victim agreed that he wore his Glock pistol on his hip at the meeting, but he denied having any other guns in his vehicle. Specifically, he denied bringing two guns and a baseball bat to the meeting at Kroger, but he admitted that he took a photograph that same morning of the guns and bat in the trunk of his car, which he sent to a friend.

Though the victim was unhappy and upset during this meeting, he did not believe his behavior was "extreme." He also described his demeanor as "very level-headed" and said that his emotions that day were only a three on a scale of ten. According to the victim, the tone of the meeting, which lasted about thirty minutes to an hour, was "very loving, forgiving, wanting to reconcile." The victim agreed, however, that he sent a text message to a friend later that evening after the meeting describing himself earlier that morning as "emotional and dangerous." The victim said that he was "absolutely not" under the influence of any kind of drugs or alcohol during the meeting.

The victim testified that he returned to his home in Lebanon after the Kroger meeting and that he communicated with Ms. Burnett later that day. The victim testified that he and Ms. Burnett "apologized to each other," that they planned to reconcile, and that Ms. Burnett intended to end her relationship with the Defendant. According to the victim, Ms. Burnet accepted his invitation to take a trip to New York City and then a subsequent trip to Nicaragua. In addition, the victim insisted that the locks on Ms. Burnett's townhouse be changed so the Defendant could not enter and that he paid for the locks to be changed. The victim said that the townhouse's locks were changed either the day of or the day after the grocery store meeting. According to the victim, Ms. Burnett also indicated that she did not want the Defendant inside the townhouse and told him that the Defendant would not be coming back.

Nonetheless, the victim admitted sending Ms. Burnett a text on August 10 telling her to delete certain pictures and stop claiming that she was an abused wife, noting that the statute of limitations had run "for personal injury and assault a long time ago." He also texted that he was "very sorry for all of it," though he explained at trial that he was merely

apologizing for breaking Ms. Burnett's teeth. In addition, on August 10, after the Defendant sent a text message to the victim that the Defendant's car door handle had been broken, the victim sent a text message to Ms. Burnett claiming that he "did rip that son of a b---h's door handle off." At trial, the victim claimed this assertion was untrue.

On Friday, August 12, the victim and Ms. Burnett flew from Nashville to New York City. The victim testified that he had asked Ms. Burnett to hire someone to watch her dog and Rebecca's cat while they were away. According to the victim, they "[a]bsolutely" had a good time while in New York, and while on the trip the victim posted some photos of himself and Ms. Burnett to his Facebook account.

The victim and Ms. Burnett returned on Sunday, August 14, and planned to leave for Nicaragua the following Tuesday. Upon arriving in Nashville, they drove to Ms. Burnett's townhouse so Ms. Burnett could pick up clothes for the upcoming trip to Nicaragua. The victim testified that he did not suspect that the Defendant would be at the townhouse and that he did not see the Defendant's car when they arrived. The victim did not have a gun on his person at the time.

Ms. Burnett entered first. The victim followed Ms. Burnett inside, his being "approximately two feet behind her." Ms. Burnett stopped and bent over to pet her dog that had come to the door to greet her. According to the victim, he and Ms. Burnett were "[a]pproximately one foot" apart and "almost touching each other" at that time. The victim testified that he stepped into the doorway and was shot in the right lung, and he looked up to see the Defendant continuing to fire from an elevated position over a short wall. The victim said that the Defendant fired all seven bullets in the ammunition clip, striking the victim with five bullets. He had five bullet wounds: two wounds in his right shoulder, and wounds in his lower intestine, right lung, and spinal column. He told Ms. Burnett that he had been shot and to call police but saw and heard that the Defendant had already called 911. The victim testified that before he lost consciousness, he heard Ms. Burnett ask, "Why did you shoot him?" He also noted that a neighbor arrived and began to render aid. The victim awoke in Vanderbilt Medical Center a few days later and learned that he was paralyzed.

The victim acknowledged that on the date of the shooting, he sent the Defendant a "poorly written" text message that included vulgar language. In the lengthy text message, the victim boasted about his reunion with Ms. Burnett and insulting the Defendant, calling the Defendant "less than s--t" and "a stalking, crying piece of s--t[,]" and expressing that "[h]opefully [he had] decided to go ahead and end [his] miserable life." The victim explained that he acted "like a hurt husband would if they knew their spouse was cheating." The victim indicated that he never threatened to shoot or harm the Defendant in any way in the text message to the Defendant.

Also, that same day, the victim had texted Rebecca and asked if the Defendant had a key to the townhouse. When Rebecca replied that the Defendant did not have a key, the victim texted Rebecca, "Okay, I'm just making sure I don't have to kill me an MF if he comes in." However, the victim also texted Rebecca that it "probably [did not] matter, [the Defendant was] entering through the garage."

Rebecca Burnett testified that in mid-August 2016, she was beginning college at the University of Tennessee. Rebecca was aware that the relationship between her mother and the victim was strained as they had recently moved out of the victim's house and returned to her mother's townhouse. Rebecca also knew that her mother was engaged in some sort of relationship with the Defendant and that the Defendant had spent some nights at the townhouse.

Rebecca substantiated the victim's physical abuse of her mother. She testified that she had seen the victim hit her mother, had seen injuries to her mother inflicted by the victim, and had taken photographs of those injuries. In April 2015, prior to the couple's separation, Rebecca was at the Lebanon home while her mother and the victim went out. While they were out, Rebecca received a phone call from her mother warning her not to be scared by her appearance when she arrived home. When her mother returned home, she was bleeding from both sides of her head. Her mother, who was upset and crying, had blood all over her face and clothes and told Rebecca that the victim had hit her. Rebecca took photographs of her mother that evening. Likewise, in October 2015, Rebecca took photographs of her mother's broken teeth. Her mother, who was upset at the time, told Rebecca that the victim had broken her teeth by backhanding her. According to Rebecca, her mother did not indicate that this incident was an accident. In addition, Rebecca testified that on other occasions, she had seen the victim hit her mother but that bleeding did not result.

Rebecca testified that on July 19, 2016, the day her mother obtained the order of protection, she saw the victim appear to tamper with the cars she and her mother drove. According to Rebecca, the hoods of the cars were raised, and the victim indicated that if she and her mother attempted to start the cars, they would be injured. According to Rebecca, she and her mother were terrified to drive their vehicles.

On August 9, the day the townhouse's locks were changed, the victim sent Rebecca multiple texts instructing her while the locksmith was there and expressing his anger that the Defendant would have a key to the townhouse. Rebecca described the victim as "freaking out" because the victim thought the Defendant was staying in the home. According to Rebecca, the victim made her stay on the phone, updating him on the locksmith's progress. At the victim's direction, Rebecca was provided only two keys— one for her and the other for her mother.

Rebecca did not know about her mother's trip to New York with the victim until after they arrived there, and Rebecca felt as if her mother might have been coerced into her decision to go with the victim. On August 14, 2016, the day her mother and victim were returning from New York, Rebecca received a text from her mother at 3:42 p.m. asking her to warn the Defendant of their return to the townhouse later that evening and advise the Defendant that he should not be there. Rebecca then sent a text to the Defendant, advising him, "Mom wanted me to warn you that Mike is coming to Rossi [a]round 7." The Defendant replied that he was confused and asked if Ms. Burnett and the victim were back together; Rebecca responded, "She might think you are still there taking care of animals. And they shouldn't be [back together]."

After the text exchange, the Defendant telephoned Rebecca. According to Rebecca, the Defendant seemed upset and confused because he had been asked to stay at the townhouse. Rebecca testified that she told the Defendant that her mother and the victim would be arriving at the townhouse together and that he should leave the townhouse before they returned "until it was clear for him to possibly come back." The Defendant told her that he would leave before they arrived, information which Rebecca conveyed to her mother. Rebecca indicated that she did not understand why her mother had gone to New York with the victim and that she could not answer the Defendant's questions about whether they had reconciled.

Rebecca testified that she assumed the Defendant was taking care of her and her mother's pets while her mother was in New York because he had been temporarily allowed to stay there. She affirmed that she texted the victim that a dog walker had been hired because she and her mother did not want the victim to know that the Defendant was staying at the townhouse and desired to protect the Defendant from the victim.

Rebecca acknowledged that the text from her mother asking her to warn the Defendant did not instruct her to ask the Defendant to leave the townhouse; however, she explained that she knew what her mother meant when her mother asked her to warn the Defendant. Rebecca did not object to the Defendant's staying at the townhouse, but she told him on the phone that he should leave for the evening.

Rebecca recognized that at 12:06 p.m. on August 14, she received a text message from the victim about what he would do if he found the Defendant at the townhouse: "Okay, I'm just making sure I don't have to kill an MF if he comes in." Rebecca indicated that she told the Defendant about this text message because she wanted to make clear to him why she wanted him to leave the townhouse before the victim arrived. Rebecca testified that the Defendant seemed upset and hurt during this conversation, but not angry. In addition, Rebecca said that the Defendant never made any threats against the victim during that conversation nor at any other time.

Rebecca affirmed that the victim carried a gun in a holster on his hip. She agreed that the victim was about five feet, ten inches tall and that he weighed over 200 pounds at the time of the shooting, making him a larger man than the Defendant. She indicated that the victim was physically imposing before he was shot.

Melanie Lokey and Marshall Farmer, Ms. Burnett's neighbors, were nearby and heard the gunshots on the evening of the shooting. Shortly after the gunshots, Ms. Lokey heard a female voice say, "You are not supposed to be here." Mr. Farmer went to the townhouse next-door once he heard the gunshots. He saw Ms. Burnett standing outside, while the victim was lying "in front of the doorway" with "his legs sort of hanging out in the walkway." According to Mr. Farmer, the victim was not moving. As Mr. Farmer entered the residence, he saw the Defendant at the top of the stairway holding a handgun and told the Defendant that he was there to help. Mr. Farmer then focused on helping the victim, who, though bleeding, was breathing and conscious, but not moving. Mr. Farmer testified that he attempted to render aid to the victim and stop the bleeding, but the Defendant did not attempt to help the victim in any way.

In addition, Mr. Farmer saw that the Defendant was still holding a weapon and told the Defendant to put it down so the Defendant would not get shot when the police arrived. Mr. Farmer also heard Ms. Burnett, who appeared surprised by the events, and the Defendant exchanging "back-and-forth words" while they were waiting on emergency personnel. According to Mr. Farmer, Ms. Burnett asked the Defendant, "'Why would you do that?' in reference to the shooting," to which the Defendant, who was crying, shaking, and distressed, replied, "[H]e threatened me."

A recording of the Defendant's 911 call that was placed at 7:06 p.m. was admitted as an exhibit. On the recording, the Defendant first said, "He's in my driveway . . . . Come here now, please, please, please!" Only seconds later, the sound of multiple gunshots followed. The Defendant gave the 911 operator the address of the townhouse and said, "Get here please! Hurry!" He was crying and frenzied. The Defendant identified the victim and informed the operator that the victim had threatened and harassed him. The Defendant also told the operator that he was upstairs, that the victim was downstairs, and that he did not want to go downstairs. A female said something to the Defendant, and the Defendant exclaimed, "He was threatening me!" He said, "I knew he was gonna try to get me." The Defendant said that the victim was on the floor and not getting up because he had shot him. He pleaded, "Hurry, please . . . . [H]e's been threatening me. . . . . I've been scared all week."

Four and one-half minutes into the phone call, the 911 operator asked the Defendant if the victim was awake, and the Defendant replied that the next-door neighbor was talking to the victim. The Defendant said that it sounded like the victim was snoring and confirmed that his girlfriend and the neighbor were downstairs with the victim. The female said, "You

weren't supposed to be here," and the Defendant replied, "I live here. You told me to be here." The Defendant relayed that the neighbor told him to put the gun down, and he complied. The Defendant indicated that the police had told him to get the gun for protection and that the gun was empty. He asked, "What did I just do?" and said, "I'm sorry."

The Defendant then gave the phone to Ms. Burnett, who informed the 911 operator of the victim's injuries. She told the operator that the victim was awake and breathing. The neighbor said that the victim was not bleeding too badly. The call ended when the police arrived and lasted about ten minutes and thirty seconds in total.

Metro Nashville Police Department ("MNPD") Officer[3] Richard Olive testified that he was one of the first officers to arrive at Ms. Burnett's townhome, arriving around 7:20 p.m. When Officer Olive arrived, he saw that the victim was on the ground "immediately" after entering the front door, and the Defendant was at the top of the stairs. Officer Olive said that he initially thought the victim was dead because the victim "was unresponsive, motionless, eyes open and covered in blood." Officer Olive did not observe a firearm in the Defendant's hand at that time, so he approached the Defendant, whom he did not perceive as a threat at that time. According to Officer Olive, the Defendant was very talkative and dramatic, and he was crying and, at some point, threw up. Officer Olive opined that it "didn't quite add up" and that the Defendant "didn't come across as sincere."

As Officer Olive went upstairs, he saw a black semi-automatic handgun lying on the top of a paint can. Officer Olive said that the Glock "had been run dry," which he explained meant that the slide had locked to the rear of the gun because there were no more bullets left to fire. Officer Olive said that the handgun could hold six rounds in the magazine and one in the chamber. The Defendant was taken into custody without incident.

MPND Crime Scene Investigators John Terry and Kayla Fulton processed and photographed the crime scene. Investigator Terry noticed gaps in the blinds of the bedroom window that sat over the garage overlooking the townhome's driveway; though one looking out this window could see the driveway, the front door, which was "inset into the building," was not visible from this vantagepoint. In addition, Investigator Terry photographed a garage door opener discovered inside the townhouse. Investigator Terry also notated that seven cartridge casings, or spent rounds, were found on the scene—they were all found downstairs and not on the second-floor landing where the Defendant was standing when he fired.

MNPD Detective Lori Gross was also dispatched to the crime scene. She described that the blinds on the window facing the driveway appeared as if someone was holding

---

[3] By the time of trial, Officer Olive had achieved the rank of detective.

them apart and looking out through them. She confirmed that it was possible to see the driveway and any vehicle parked there from that vantagepoint but that the front door could not be seen from this window. In addition, Detective Gross testified that she found the Defendant's car parked in a different part of the complex, and she found a receipt from a storage facility date-stamped August 12, 2016, at 3:36 p.m.

Investigator Fulton photographed the Defendant's car "about a tenth of a mile" from Ms. Burnett's townhouse in a public parking spot in the complex. According to Investigator Fulton, the Defendant's car, though near, was not within sight of Ms. Burnett's residence.

The Defendant, Ms. Burnett, and Dr. Stephen Montgomery all testified for the defense. The Defendant detailed his relationship with Ms. Burnett. He explained that they met in November 2015, when he bought a vehicle from her at her residence in Lebanon. A few months after their meeting, Ms. Burnett texted the Defendant and asked if the Defendant could return the license plate that was on the vehicle he bought. When the Defendant returned the license plate, Ms. Burnett confided in him about her troubled marriage. Ms. Burnett said that the Defendant "made a very strong impression" and offered to help with Ms. Burnett's and the victim's rental properties. Three to four weeks later, in March 2016, the Defendant and Ms. Burnett began a romantic relationship. During their relationship, they discussed marriage. The Defendant stated that he believed that Ms. Burnett and the victim were planning to divorce, that he was in love with Ms. Burnett, and that he intended to marry her. Ms. Burnett confirmed that they kept the relationship secret from the victim, who, according to Ms. Burnett, "was busy with his own relationships."

The Defendant and Ms. Burnett communicated frequently during this time. According to the Defendant, Ms. Burnett told him that her relationship with the victim "was a living hell that she couldn't wait to get out of." In addition, Ms. Burnett told the Defendant that the victim had physically and mentally abused her and had shown him photographs depicting her various injuries.

Ms. Burnett detailed the physical abuse. She said that there was time in April 2015 that the victim punched her four times during an argument while she was driving and then punched her four more times after she pulled over and he began driving. In October 2015, during an argument while driving home after dinner, the victim intentionally backhanded Ms. Burnett, breaking her front teeth with his "special forces" ring. In May 2016, after she and the victim left a bar, the victim slammed the car door on her, almost knocking her down. Ms. Burnett said that when they arrived home from the bar, the victim told her that their pending divorce action would not matter because she would be dead soon. In June 2016, during an argument while they were in bed, the victim placed Ms. Burnett in a choke hold, causing her earring to poke into her neck. Multiple photographs reflecting these injures were entered into evidence.

Ms. Burnett called the Defendant on July 19, 2016, requesting help because the victim had tampered with her vehicle. The Defendant went to the victim's home in Lebanon. The victim was inside the house when the Defendant arrived. The Defendant testified that he looked at Ms. Burnett's vehicle and discovered that the victim had unplugged some sensors on the car so the engine would not start and had disconnected some fuses. The Defendant was able to reattach the sensors. Later that evening, police were called, and Ms. Burnett, on the advice of police, obtained the temporary order of protection against the victim.

They returned to the Lebanon residence after being notified that the order of protection had been served on the victim. According to the Defendant, the victim was required to stay away from the Lebanon residence, but he, nonetheless, attempted to enter the home later than night. Ms. Burnett called police, who arrested the victim. The Defendant testified that shortly thereafter, the victim contacted him from jail and asked him to convince Ms. Burnett to drop the order of protection. The Defendant said that the victim asked him if he was having an affair with Ms. Burnett, and he claimed that he denied the affair in order to protect Ms. Burnett. Also, the victim, being barred by the order of protection, asked the Defendant to start informing on Ms. Burnett's whereabouts.

According to Ms. Burnett, the order of protection was dismissed after she signed divorced papers and agreed to move out of the victim's home within ten days. The Defendant indicated that on August 4, 2016, he went with Ms. Burnett and Rebecca to move their belongings out of the victim's home. The Defendant said that when the victim, who was present during this time, grabbed the Defendant's phone that was lying on desk and locked himself in the bathroom, where he went through the phone and learned of the affair between the Defendant and Ms. Burnett. The Defendant said that when victim later emerged, the victim was irate and told everyone "to get the F out." The Defendant described the victim as "[r]eady to snap." According to the Defendant, the victim aggressively harassed and bullied him in a barrage of text messages after the victim discovered the Defendant's relationship with Ms. Burnett. Ms. Burnett described that after the Defendant learned of the affair, he became "hostile and mad" towards the victim.

The Defendant said that he helped Ms. Burnett move into her townhome later that day and that he moved into the residence with her, bringing most of his possessions to the home, including his tools, all of his clothes, and toiletry items. The Defendant stated that Ms. Burnett gave him a key to the townhouse. However, Ms. Burnett said that the Defendant ended up spending several nights there after the "chaos" of moving out of the victim's home in order to protect her, but she would not have described them as living together.

The Defendant claimed that he parked his car in the driveway his first day at the townhouse. However, Ms. Burnett later told the Defendant to park on another street so that

the victim would not see the car when he drove by the townhouse because Ms. Burnett feared the victim would harm the Defendant. The Defendant said he started parking in spots that were not visible from the townhouse at Ms. Burnett's direction.

According to the Defendant, a few days later, he returned to the victim's home to help Ms. Burnett move the rest of her belongings. While there, the victim demanded to look inside two suitcases that the Defendant was carrying. The Defendant stated that the victim had a pistol on his hip and threatened to "end" him if he removed any property that did not belong to Ms. Burnett. The Defendant asserted that he later texted the victim and told him to stay away from him because the victim had been driving by the townhouse, sometimes dropping off items that did not belong to Ms. Burnett, in an attempt to see if the Defendant was there.

Ms. Burnett asserted that on August 9, 2016, she received information that the victim was very upset. She phoned him and set up a meeting in a Kroger parking lot because she did not want him near her home. She said that the victim was distraught, crying and apologetic, and wanting to reconcile with her. She estimated his level of being upset as a ten on a scale of one to ten. Ms. Burnett indicated that during the meeting, the victim relayed to her his intention to kill the Defendant. Ms. Burnett described the victim, as upset, irrational, and "beet red." The victim told Ms. Burnett he wanted to pull the flesh off his body. Ms. Burnett said she saw the victim with a pistol during the meeting and that she took the gun from him; however, she later returned the gun to the victim at the end of their meeting. Ms. Burnett verified that she told the Defendant about this incident, including that the victim was looking for the Defendant and intended to kill him. Similarly, the Defendant testified that on August 9, Ms. Burnett told him that the victim had loaded guns into his car and left home intoxicated, intending to kill the Defendant. The Defendant indicated that after hearing this, he did not feel safe.

According to the Defendant, the locks on the townhouse were changed on August 9, although Ms. Burnett and Rebecca had never complained about the locks. Ms. Burnett testified that the victim wanted to change the locks to keep the Defendant out of the house. Ms. Burnett indicated that she agreed to change the locks in order to appease the victim but that she felt coerced to do so. Both the Defendant and Ms. Burnett testified that after the locks were changed, Ms. Burnett gave the Defendant a garage door opener so he could enter the townhouse through the garage.

Ms. Burnett testified that she had concerns about the victim's hurting or killing the Defendant and that she conveyed these worries to the Defendant. On the evening of August 9, Ms. Burnett texted the Defendant that she could not have the victim killing either of them. She admitted that the Defendant texted back, "He won't kill anyone." However, the Defendant admitted that he did not feel the need to get a gun after learning of the August

9 incident, and he claimed it was because Ms. Burnett could stop the victim from harming him.

The Defendant alleged that he called police about the victim on August 10, 2016, in an effort to keep the victim away from him. Based on his conversation with the officers, the Defendant did not feel that he could take out an order of protection because he was not directly related to the victim or in a relationship with him. The Defendant acknowledged a series of texts with Ms. Burnett on August 11 and that he knew that Ms. Burnett was with the victim during these texts. The Defendant indicated that he was unsure if Ms. Burnett would return to the townhouse that evening; she did not. Ms. Burnett had informed the Defendant that she would have to spend some time with the victim, in part to ensure that the victim would fulfill his promise to pay Rebecca's college tuition.

On August 12, the Defendant again called police after getting text messages from an unknown number claiming to be Ms. Burnett. After speaking with police, the Defendant went to a storage unit and obtained a gun in what he claimed was an effort to protect himself. The Defendant stated that he knew that there was a gun in the storage unit because he had previously helped Ms. Burnett move some of her belongings into storage sometime in May or June. According to the Defendant, when he took the gun, he had no plans to kill the victim.

The Defendant learned on August 12 that Ms. Burnett had traveled to New York City with the victim. Ms. Burnett confirmed that while she was away, she had asked the Defendant to take care of her pets, so he had her consent to be inside the townhouse that weekend. After discovering that Ms. Burnett and the victim were together, the Defendant was upset and concerned about Ms. Burnett's safety. He also admitted the trip was "upsetting" and frustrating to him. He conceded that he had possibly gone on Facebook at least thirty or forty times under Ms. Burnett's account. He indicated that he was not "interested" in what the victim was posting on Facebook but that he was simply making sure Ms. Burnett was still alive.

On the afternoon of August 14, the date of the shooting, the Defendant received an email from the victim reading, "Yeah, you got f--king played." Shortly thereafter, the victim sent the Defendant a vulgar and demeaning text expressing a desire for the Defendant to commit suicide. The Defendant admitted that this text message did not contain a direct threat, though he indicated that the victim had threatened him on prior occasions. After receiving the text message, the Defendant again called the police in the hopes that they could "[s]top" the victim. However, the Defendant admitted that during this 911 call, he did not tell the police that he was concerned about Ms. Burnett's welfare.

Also, on August 14, the Defendant received several texts from Rebecca indicating that the victim might be coming by the townhouse later. The Defendant testified that he

was confused by the texts because he believed "there was no way that [Ms. Burnett] would go back to the abuse that she had been a victim of" at the hands of the victim. He thought it would not have made sense for Ms. Burnett to have reconciled with the victim. He asserted that he knew they were both in New York but that he did not know they were together there.

The Defendant said that he subsequently spoke with Rebecca on the telephone after the text message exchange and that Rebecca informed him that the victim had sent her a text message threatening to kill the Defendant. The Defendant alleged that after speaking with Rebecca, it was not clear to him whether the victim was coming to the townhome; he thought that the victim might have been in the area "driving around" and "doing his stalking thing." Though the Defendant knew that the victim might be nearby that evening, he did not feel like he had to leave the townhouse.

According to Ms. Burnett, after she and the victim returned to Nashville from New York on August 14, they planned to go from the airport to the townhouse to check on her pets and to pick up clothes for the upcoming Nicaragua trip. Ms. Burnett explained that she had agreed to go on these trips to keep the victim happy and away from the Defendant. Ms. Burnett said that by the time she and the victim decided to go to the townhome, she was not expecting the Defendant to be there or she would not have gone. Ms. Burnett testified that she entered the townhouse before the victim and that as she did so, her pets came running toward her. Ms. Burnett said that she was talking to her dog and standing under the stairs when she heard the shots. Once Ms. Burnett saw the Defendant, she was surprised by his presence and said, "What are you doing here?" She agreed that she might have said something like "You weren't supposed to be here." Ms. Burnett estimated that she had been in the house for only about thirty seconds and was eight feet inside of the house when the Defendant started shooting.

The Defendant testified that he was in the bedroom of the townhouse when he heard a car pull into Ms. Burnett's driveway that evening. When the Defendant looked out the window, he saw the victim's black BMW and was afraid because he thought that the victim "was there to finish what he started, to kill [him]." He said that he assumed the victim had a key to the townhouse because the victim had recently changed the locks there. The Defendant said that he immediately called 911, though he did not mention during the call his being concerned for Ms. Burnett's safety. The Defendant said that he saw the victim get out of the car but that he could not tell if the victim had a gun. The Defendant did not see anyone else with the victim. While on the phone with the 911 operator, the Defendant walked to the bed and grabbed the gun that he had retrieved earlier from the storage locker.

According to the Defendant, when he walked out of the bedroom to check the front door, the victim was already coming up the stairs. The Defendant believed he was incapable of fighting off the victim and that he would lose or get killed if they got into a

physical fight.  The Defendant explained that the victim was physically bigger than he was and that the victim seemed like a tough, aggressive person.  In addition, the Defendant knew that the victim had been in the military and carried guns, and he believed that the victim had received specialized training in fighting.

The Defendant said that he thought he had to defend himself because the victim was coming for him, so he shot the victim.  He only remembered shooting one time, but he acknowledged that he ultimately shot the victim seven times.  The Defendant said that he never saw Ms. Burnett until after he shot the victim.  Ms. Burnett testified that after the Defendant shot the victim, the Defendant was crying and was so upset that she could not understand what he was saying.  The Defendant admitted that he could have left the townhouse so that he would not have been there when the victim arrived.  He further admitted that he did not tell the 911 operator that the victim broke into his house or that the victim was trying to kill him.

Dr. Stephen Montgomery, a forensic psychiatrist and assistant professor at Vanderbilt University, testified as an expert witness for the defense.  He testified that he evaluated the Defendant based upon a two-hour interview and a review of police reports, witness statements, the Defendant's 911 call, and eighteen years of the Defendant's medical and mental health treatment records from the Veterans Administration ("VA") hospital.  He also reviewed commendations and awards the Defendant received during his military service in the Marines.

From this information, Dr. Montgomery diagnosed the Defendant with post-traumatic stress disorder ("PTSD") and clinical depression.  According to Dr. Montgomery, the Defendant's PTSD stemmed from his experiences attempting to resuscitate an infant who had been in a car accident and ejected onto the road and recovering bodies of people killed during a hurricane in Honduras in 1999.  Dr. Montgomery was asked to explain what led him to diagnosis the Defendant with PTSD, and Dr. Montgomery mentioned the Defendant's service in the military and the Defendant's experience in Honduras during hurricane aid.

Once Dr. Montgomery started to reference statements the Defendant made in his interview, the State requested a bench conference.  The State objected to allowing Dr. Montgomery to testify about specific statements the Defendant made during the interview, arguing that those statements were self-serving hearsay and inadmissible.

The trial court ruled that Dr. Montgomery could not testify about specific statements that the Defendant made during the interview but that he could testify that he reviewed the Defendant's statements and medical records in reaching his diagnosis.  The trial court explained that Dr. Montgomery could testify about the nature of the materials and the

conversations in general that he reviewed but that he could not address specific information he received from the Defendant or others in interviews.

Dr. Montgomery then testified that he based the Defendant's PTSD diagnosis on his "diagnostic interview" with the Defendant and his review of other documents and materials. Dr. Montgomery opined that at the time the Defendant shot the victim, the Defendant, due to his PTSD, was not sufficiently free of excitement and passion as to be capable of exercising reflection and judgment prior to acting, i.e., the Defendant was not capable of forming premeditation. Dr. Montgomery testified that the recording of the 911 call indicated that the Defendant was in a highly emotionally charged state. Dr. Montgomery agreed that the Defendant's PTSD made him more likely to feel threatened when the victim entered the townhouse than a person would feel who did not have PTSD. He said that it would take a person with PTSD longer to figure out that he was not actually facing a threat. Due to the Defendant's PTSD, the Defendant's fear and perception of threat was heightened and distorted, and he would have a greater propensity to feel threatened by the circumstances he encountered. Also, the Defendant would have taken more time to realize that he was not actually in danger and would have stayed in a panicked and agitated state for longer than usual.

On cross-examination, Dr. Montgomery was asked if the Defendant's records indicated any sort of mental health illness prior to October 2016. Dr. Montgomery replied that Defendant's VA records reflected that the Defendant was prescribed an antidepressant medication in 2009 but that the medication was discontinued later that same year. Moreover, Dr. Montgomery agreed that those same VA records indicated that the Defendant denied any history of anxiety and depression prior to his VA visit in October 2016.

Dr. Montgomery was questioned about statements the Defendant made to VA personnel during his visit in October 2016, as well as subsequent visits. Dr. Montgomery confirmed that the VA records reflected that the Defendant reported a traumatic event in which his girlfriend's ex-husband broke into their home, described the incident as a home invasion, said the victim tried to kill him after breaking into the home, stated he shot the victim after the victim broke into the home, said he was attacked, stated that the victim almost killed him, and said that the victim entered the house armed with a gun. In addition, the Defendant initially denied any history of traumatic events or any exposure to combat while in the military, but his records later, in 2018, documented combat trauma. Dr. Montgomery acknowledged that the VA diagnosed the Defendant with PTSD due to combat trauma and the events that took place on August 14, 2016; however, Dr. Montgomery opined that the August 14 events only exacerbated the Defendant's pre-existing PTSD.

Dr. Montgomery was asked if he notated in his report any inconsistencies in the Defendant's statement based on who he was talking to at the time. Dr. Montgomery answered that he noticed "what was said in the records" and that he noted that the Defendant had "one interpretation of events and other people [had] a different" one. The prosecutor then said, "Well, let's stop there, Doctor, because I see about three interpretations of what happened." Defense counsel asked that Dr. Montgomery be allowed to answer, and the trial court responded, "[Defense counsel], let him cross-examine. You can clean things up on redirect." Thereafter, Dr. Montgomery agreed that the Defendant might have told other "people at certain points in time one thing that [did not] line up with the . . . information [he] got from the discovery" he received.

Dr. Montgomery was then asked about specific statements the Defendant made to him during their interview, including the Defendant's statement that he saw the victim coming up the stairs. Montgomery agreed that none of the VA records indicated that the Defendant described the victim coming up the stairs. When asked if it was possible that the Defendant attempted to delve into his past to select events that he could describe as traumatic after being criminally charged with the victim's shooting, Dr. Montgomery admitted that "anything is possible." Dr. Montgomery conceded that the Defendant had not reported any signs or symptoms of PTSD prior to the date of the shooting. Finally, Dr. Montgomery agreed that the exact language of his diagnosis that the Defendant lacked premeditation tracked the language of the instruction that the jury would be given in this case.

On redirect examination, Dr. Montgomery was asked about legal concepts like competency and the insanity defense. Dr. Montgomery was then asked if, simply by virtue of his being declared an expert in forensic psychiatry, he was allowed "to just come in and talk about anything that [was] going on with a person accused of a crime." Dr. Montgomery agreed that he was not permitted to do so and explained, "There are lots of rules in court."

When defense counsel attempted to question Dr. Montgomery more specifically about "one of those rules . . . in this type of testimony[,]" the prosecutor objected. At the ensuing bench conference, defense counsel submitted that the State had just finished talking "about this particular standard" on cross-examination and observed, "[W]e all know that that's the only thing that [Dr. Montgomery] can offer in terms of his opinion." The trial court sustained the objection and instructed defense counsel as follows:

> You cannot go into the rules of evidence with this jury. That is inappropriate. You can try to rehabilitate him with the trustworthiness and veracity of the data on which he relied. You can rehabilitate him specifically based on the data on which he relied, but you cannot talk to this jury about the legal standards or about the laws of evidence.

-17-

. . . .

You may rehabilitate him on the trustworthiness of the data on which he relied. That is the only thing the State focused on was the trustworthiness of the data.

In the presence of the jury, the following exchange then occurred:

Q. [DEFENSE COUNSEL]: The data that you—well let me ask it this way: There were several points in the cross-examination where I felt like you wanted to explain—

[THE PROSECUTOR]: Objection to how [defense counsel] felt.

THE COURT: Restate your question and be specific about what you want to rehabilitate him on.

Thereafter, defense counsel presented Dr. Montgomery with specific instances that occurred on cross-examination and Dr. Montgomery was permitted to explain further—like the Defendant's failure to report his mental health history earlier and the various ways the Defendant described the August 14, 2016 events to VA personnel. In fact, Dr. Montgomery opined that the Defendant's inaccurate memory of the trauma was consistent with the PTSD diagnosis.

Dr. Montgomery did not find the Defendant to be malingering or pretending to have symptoms. Dr. Montgomery testified that the "older trauma" did not come out during the interview until he "pointedly ask[ed]" the Defendant about it. According to Dr. Montgomery, when the Defendant did eventually start talking about it, he was shaking and crying and had to take some medication that he had brought with him. Dr. Montgomery also opined that the Defendant's demeanor on the 911 call, his being distraught and fearful, was consistent with his diagnosis.

Dr. Montgomery confirmed that he was present during the Defendant's testimony. He was asked if the Defendant's testimony sounded like "he was describing a home invasion or a break-in?" The prosecutor objected, stating that the jury heard the Defendant's testimony for itself. A bench conference ensued, during which defense counsel argued that the State, by utilizing the inconsistencies in the VA records, tried to impeach the Defendant's version of events and that it was not an attempt to impeach Dr. Montgomery's conclusions. Defense counsel asserted that he should be able to ask Dr. Montgomery "did [the Defendant] say to the police that it was a home invasion." The trial court sustained the objection, finding that the State was entitled to impeach Dr. Montgomery's opinion and the data on which he relied in reaching that opinion. The trial

-18-

court determined that the defense was "not entitled to admit the [Defendant's] statement." Defense counsel also requested that the trial court instruct the jury that it should consider statements attributed to the Defendant for the limited purpose of impeaching Dr. Montgomery's opinion and that it did not impeach the Defendant. The trial court denied this request, finding that this was a matter of impeachment only.

After Dr. Montgomery's testimony was completed, the defense, outside of the jury's presence moved for a mistrial due to the trial court's restrictions on Dr. Montgomery's testimony. Defense counsel raised two specific instances that he argued greatly prejudiced the Defendant and violated the Defendant's rights to a fair trial and due process under both the United States and Tennessee Constitutions. Defense counsel first contended that Dr. Montgomery should have been allowed to testify about statements that the Defendant made to him during the interview because Dr. Montgomery relied on those statements in arriving at his diagnosis. According to defense counsel, the Defendant's statements to Dr. Montgomery were not hearsay because they were not offered for the truth of the matter asserted; they were offered to support Dr. Montgomery's opinion and how he arrived at that opinion.

Next, the Defendant argued that the trial court's comments during Dr. Montgomery's testimony that the defense "would have the ability" to rehabilitate Dr. Montgomery constituted improper judicial comments. According to defense counsel, the two rehabilitation comments "telegraph[ed] to the jury that [the trial court] believe[d Dr. Montgomery] need[ed] rehabilitating and that things [were] going badly" for the defense.

The prosecutor responded that Dr. Montgomery was not permitted to delve into the "underlying things" supporting his diagnosis in the way defense counsel suggested. The prosecutor said that because the defense put the Defendant's mental health at issue, it was entitled to cross-examine Dr. Montgomery about the data on which he relied in reaching his diagnosis.

The trial court denied the Defendant's motion. The trial court noted the hearsay issue had been thoroughly discussed and that the court agreed with the State's assessment "on the proper scope of the direct testimony or direct examination of an expert witness and the matters that [could] be delved into at that juncture." The trial court also denied the motion "with regard to the reference to the rehabilitation of the witness" and noted that the jury would "be thoroughly instructed on what they may or may not consider in reaching their verdict," including instructions that any comments by the court were not evidence and that the trial court had not "drawn, nor w[ould] it draw, any conclusions by any words, expressions from the bench, as to how the jury should rule."

-19-

At the conclusion of proof, the jury found the Defendant guilty of the lesser-included offense of attempted second-degree murder, a Class B felony. A sentencing hearing was held on March 6, 2020.

B. <u>Sentencing Hearing</u>. At the beginning of the sentencing hearing, the State introduced a copy of the Defendant's presentence report. The report indicated that the Defendant had a 2016 Sumner County conviction for a misdemeanor driver's license violation; 2014 Davidson County misdemeanor convictions for domestic assault and harassment, for which he was placed on probation; a 2010 Sumner County conviction for a misdemeanor driver's license violation; a 2009 Illinois conviction for a misdemeanor violation of an order of protection, for which he received one-year of court supervision; and a 2002 Sumner County conviction for misdemeanor reckless driving. Certified copies of these convictions were entered at various points. Also, a report from the Administrative Office of the Courts reflecting the types and average length of incarceration time for sentences imposed for attempted second-degree murder in Tennessee between 2008 and 2019 was admitted as an exhibit.

The fifty-two-year-old victim testified that he joined the Army in 1986 after high school and served in the Army for twenty-two years, eventually becoming an officer. During his time in the Army, the victim served in the special forces and was a Green Beret. He served in combat in more than 400 engagements, including multiple tours overseas, and was injured twice during combat. He received several awards for his service, including the Legion of Merit and Bronze Star, and he was commended by the president after killing a well-known terrorist. In addition, he worked as a defense contractor after he retired from the Army.

The victim had been married once previously in 2009 before divorcing and marrying Ms. Burnett; during that marriage, he purchased the home in Lebanon. He confirmed that while married to Ms. Burnett, the Defendant shot him five times, and he detailed the injuries he sustained from the shooting. The victim said that the first bullet entered the victim's right lung and caused a collapsed lung and rib fractures. A second bullet ruptured the victim's colon, resulting in the loss of a third of his colon and continuing bowel issues. A third bullet entered the victim's body "a half centimeter from [his] aorta, or [his] heart," and hit the victim's spinal cord, paralyzing him from the chest down. Two additional bullets struck the victim in his right shoulder. The shooting left the victim confined to a wheelchair for the remainder of his life and suffering from an immune system deficiency.

After being shot, the victim knew he had been severely injured and noted that neither the Defendant nor Ms. Burnett attempted to assist him, though they could have. The victim said that he knew he "was hurt pretty bad" and that the Defendant and Ms. Burnett left him "on the floor to die." According to the victim, Mr. Farmer saved his life.

-20-

The victim received treatment for his gunshot wounds at Vanderbilt Medical Center. While there for fifty-five days, the victim underwent extensive surgeries, including "ileostomy surgery" or "basically a bag coming out of your colon so you can go to the bathroom." He also had to permanently use a catheter to urinate. He was later transferred to a rehabilitation center for sixty-five days, which was designed to help him recover physically and to learn "how to live again, basically, a new kind of life." The victim had to return briefly to the hospital for treatment of an ulcer infection, which led to a staph infection. Doctors attempted to move the victim as little as possible because he continued to get sick during his surgeries, and he subsequently developed a bedsore. In addition, the victim had to prolong surgery on his right lung to remove the remainder of the bullet fragments due to staph. The victim still returned to the VA hospital and Vanderbilt quite often for checkups.

The victim said that the Defendant was found liable for the shooting in a 2018 civil proceeding and that he was awarded more than eighty-six million dollars. However, the victim had not recovered any money from the judgment, though he continued to accrue out-of-pocket expenses. The victim estimated that he had spent $150,000 of his own money after being shot.

The victim sought psychiatric help after the shooting because the memory of simply trying to stay alive while the Defendant was above him and not rendering aid was "still engrained in [his] brain." The victim said that he also took medication for his anxiety. The victim testified that the shooting had the greatest impact on family life, as his permanent disability affected his relationship with his son and grandchild.

Emily Roberts testified that she met the Defendant on a dating website in 2014 and had an intimate, but brief, relationship with him. She described the Defendant's character as "unusual," and said that he "looked through [her] things," including going through her phone and erasing male contacts. She stated that the Defendant had also called her ex-husband and an old boyfriend and threatened them both.

In July, Ms. Roberts ultimately decided to end the relationship and drove to the Defendant's residence in Goodlettsville that he shared with his mother and father. Ms. Roberts testified that the Defendant, upon receiving the news, aggressively knocked her to the floor and took her phone and car keys to prevent her from leaving. She said that she ran inside and spoke with the Defendant's parents, who convinced him to return her car keys to her. Ms. Roberts retrieved her belongings, and as she was driving away on Interstate 65, she noticed the Defendant traveling at a high rate of speed behind her, "getting her rear and left and right." Ms. Roberts said that she feared for her safety and called 911, though the Defendant repeatedly called her to interfere with the call with 911. Ms. Roberts eventually did not see the Defendant following her, so she exited the interstate and hid in a parking lot until the police arrived. Ms. Roberts said that she attempted to call

her roommate's husband, but her phone did not have service because the Defendant had turned it off. Ms. Roberts did not recall having any of the Defendant's or his parents' property in her possession on this occasion.

After the incident, the Defendant continued to call and harass Ms. Roberts. Ultimately, the Defendant was charged with aggravated assault with a deadly weapon (a motor vehicle) and harassment due to the incident, and he pled guilty to reduced charges of simple assault and received probation. After the guilty plea, as Ms. Roberts was trying to leave the courthouse, she encountered the Defendant standing outside a door in the bottom of the building, which again caused her to fear for her safety; a police officer escorted her from the building.

The Defendant called his brother, mother, father, and two long-time friends to testify on his behalf. In addition, Dr. Montgomery's forensic psychiatric evaluation report was admitted as an exhibit. A character reference letter from a third friend, who was unable to travel due to physical health concerns, was entered as an exhibit.

Shannon Potts, the Defendant's older brother, testified that the Defendant was a "typical little brother." He said that the Defendant lived with his parents on an eight-acre rural property and that the Defendant assisted his father with things around the property like maintenance and home repairs. Shannon[4] claimed that the Defendant was "really kind-hearted," wanting to assist others, and that he was loyal "to a fault" and reliable. Shannon testified that the Defendant joined the Marines after graduating high school and that he was very proud of the Defendant.

Shannon said that the Defendant started receiving mental health treatment from the VA shortly after the shooting. He agreed that his brother seemed to be doing well with his treatment and believed that he was not getting the attention he needed for his mental health prior to the incident. Shannon did not believe that a sentence of incarceration would benefit the Defendant and requested probation. Shannon, though acknowledging the seriousness of the victim's injuries, stated his belief that "more than one person was at play" in the shooting and that the Defendant believed that shooting the victim "was his only option." According to Shannon, he and the rest of his family were willing to assist and support the Defendant if he received probation. Shannon also mentioned that the Defendant was very proud of his son.

Beverly Potts, the Defendant's mother, testified that the Defendant had lived with her and her husband since 2016 and helped them with their everyday tasks of maintaining the property. She described the Defendant as a "regular kid," who did average in school

---

[4] Because the Defendant and Shannon Potts and Gary Potts share a surname, we will again to refer these witnesses by their first names. No disrespect is intended.

and played sports. Ms. Potts noted that the Defendant joined the Marines and that he was later honorably discharged after six years' service. She stated that the Defendant met President Bill Clinton in Honduras after the Defendant's unit had gone there to assist with hurricane relief and that he received a "citation" for his work there. Ms. Potts said that the Defendant was more intense and quicker to anger after he returned home from the Marines and that he was not the same person he was when he left after high school. Ms. Potts said that she encouraged the Defendant to seek mental health treatment, but he declined to do so.

The Defendant's release on bail in this case was conditioned upon him obtaining counseling and living with his parents, which he continued to do. Ms. Potts affirmed that the Defendant had been in continuous treatment since 2016. Ms. Potts said that she believed that treatment had helped the Defendant and that he had calmed down and now enjoyed family outings, which he did not participate in before. Ms. Potts said that the Defendant did not use alcohol to excess or use drugs. Ms. Potts believed that incarceration "would be harmful for" the Defendant because he did not do well "closed in" or "with a bunch of people." She confirmed that the Defendant could remain at home with her and her husband and that he would comply with any conditions the trial court imposed.

The Defendant's father, Gary Potts, testified and disputed Ms. Roberts's account of the July 2014 incident. Gary testified that Ms. Roberts arrived at the residence that night with overnight bags, which did not indicate to Gary that Ms. Roberts intended to end the relationship with the Defendant. Gary also asserted that Ms. Roberts left the property with the Defendant's credit card and house key and that the property was later returned by Ms. Roberts's attorney. Gary acknowledged that he did not call police to report that Ms. Roberts possessed the house key.

Gary said that he was still proud of his son, even after these events. Gary asserted that he would support the Defendant if he received an alternative sentence. He stated that the Defendant could live with him and that he would assist the Defendant with any treatments or other conditions the trial court imposed.

Both Michael Anzalone and Michael Boone testified that they considered the Defendant a trustworthy and reliable friend. Mr. Boone stated that as a salesman, the Defendant was very professional and helpful to Mr. Boone, who bought supplies from the company for which the Defendant worked. Mr. Boone began a friendship with the Defendant after the Defendant went to work for a friend of Mr. Boone's. Both men agreed that they would be comfortable if the Defendant received probation and that the Defendant could successfully complete probation. The Defendant's younger sister was also present in the courtroom but did not testify.

In an allocution, the forty-one-year-old Defendant said that he had constantly relived the shooting and admitted that he could not undo the damages he caused to the victim and the victim's family in the shooting. He asserted that he regretted his actions and wished "that there was a different way that this could have come out."

At the conclusion of the hearing, the trial court took the matter under advisement. Thereafter, the trial court, on June 12, 2020, announced the sentence in open court. The trial court determined that five enhancement factors were applicable to the Defendant. The trial court also considered the mitigation evidence offered by the Defendant, and though not finding any specific mitigating factor applicable, did consider under the "catch-all" mitigator that the Defendant's military service was commendable and that the devotion of his friends and family was evident. Thereafter, the trial court sentenced the Defendant as a Range I, standard offender to a twelve-year sentence of incarceration.

C. Post-Trial Motions. The Defendant filed a timely motion for new trial. In the motion for new trial, the Defendant argued that the trial court "erred in how it handled defense witness Dr. Stephen Montgomery," including preventing Dr. Montgomery "from testifying about the data, observations, and background information that led him to reach his opinions." He submitted an affidavit from Dr. Montgomery, who asserted that the trial court prohibited him from testifying about the underlying material and reasons that led to his conclusions and fully supported his opinions. Dr. Montgomery stated that this material included his forensic interview with the Defendant, the Defendant's 911 call, the Defendant's VA medical records, and statements from witnesses describing the Defendant's behavior after the shooting. Dr. Montgomery asserted that he would have testified how the contents of this material buttressed a diagnosis of PTSD and made it unlikely that the Defendant was faking his symptoms. Dr. Montgomery asserted that he was unable to explain to the jury that the materials upon which he relied were the type that experts in his field typically used to reach their opinions.

The Defendant also argued in this motion for new trial that the trial court's "use of the term 'rehabilitate' in front of the jury was improper because it suggested that Dr. Montgomery's credibility had been damaged." The Defendant noted that the trial court denied his motion for a mistrial after Dr. Montgomery's testimony. The Defendant further submitted that the evidence was insufficient to support the verdict.

Ultimately, the motion for new trial was denied. This appeal followed.

ANALYSIS

In this direct appeal, the Defendant alleges that (1) the evidence was insufficient to support his conviction; (2) the trial court erred by prohibiting the defense expert from testifying about the reasoning and science upon which he based his opinion of the

-24-

Defendant's mental condition at the time of shooting; (3) the trial court erred by denying the Defendant's motion for a mistrial after the trial court stated in the jury's presence that defense counsel could "rehabilitate" and "clean up" the Dr. Montgomery's testimony; and (4) the trial court erred in sentencing the Defendant, both in imposing the maximum sentence, as well as in imposing a sentence of continuous confinement. We will address each issue in turn.

### *I. Sufficiency of the Evidence*

The Defendant argues that the evidence was insufficient to support his conviction for attempted second-degree murder. The Defendant submits that he acted in justifiable self-defense or, alternatively, that the evidence, at most, supported a conviction for the lesser-included offense of attempted voluntary manslaughter. The State counters that it sufficiently rebutted the Defendant's claim of self-defense and, furthermore, that the evidence does not support the Defendant's claim that he was in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

When examining the sufficiency of the evidence, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and

circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Second-degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). As pertinent to this case, a person commits criminal attempt who, acting with the culpability otherwise required for the offense, either: "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part"; or "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(2), (3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

Our supreme court has determined that second-degree murder is a "result-of-conduct" offense, meaning that the statute focuses "on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000); see also State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010). Here, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Whether a defendant acts knowingly is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105; see also Brown, 311 S.W.3d at 431.

The Defendant submits that he acted in justifiable self-defense. In Tennessee, a person who is not engaged in unlawful activity may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2)(A), (C) (2016) (subsequently amended). The danger creating the belief of imminent death or serious bodily injury must be real or honestly believed to be real at the time. Tenn. Code Ann. § 39-11-611(b)(2)(B) (2018) (subsequently amended). If the person was not engaged in unlawful activity, there is no duty to retreat before using deadly force. See State v. Perrier, 536 S.W.3d 388, 394-01 (Tenn. 2017).

When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual

-26-

determination to be made by the jury as the sole trier of fact. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998) (citing State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527. Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

According to the Defendant, he had a reasonable belief, based upon reasonable grounds, that he was in imminent danger of death or serious bodily injury when the victim entered the townhouse. Specifically, the Defendant asserts that his fears that the victim could kill him were reasonable based upon the victim's multiple threats to kill him because the Defendant was romantically involved with Ms. Burnett; the victim's violent, assaultive behavior towards Ms. Burnett on multiple occasions; the victim's habit of going armed; and the victim's physically imposing and aggressive demeanor, as well as the victim's military training. The Defendant submits that he only obtained the gun from the storage unit for protection and that he had no plans to kill the victim. The Defendant further notes that on the day of the shooting, the victim texted Rebecca that he would kill the Defendant if the Defendant was found in the townhouse—information that Rebecca relayed to him; that the Defendant called 911 after receiving a text message from the victim that day wherein the victim expressed his hope that the Defendant would commit suicide; and that when the victim arrived at the townhouse, the Defendant immediately called 911 requesting assistance.

The Defendant alternatively argues that even if the State met its burden of proving that he did not act in self-defense, the evidence supports, at most, a verdict for the lesser-included offense of attempted voluntary manslaughter. Voluntary manslaughter is statutorily defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The Defendant contends that the evidence was consistent with attempted voluntary manslaughter and inconsistent with attempted second-degree murder.

The Defendant largely derives his argument that he acted in self-defense from his own testimony. The Defendant's sufficiency issue relates to the weight of the evidence and the jury's credibility determinations, which this court will not disturb on appeal. Bland,

958 S.W.2d at 659. The jury, by its verdict, rejected the Defendant's account of the shooting, as was its prerogative.

Moreover, because the jury unanimously found the Defendant guilty of attempted second-degree murder, it was not required to then determine whether he was guilty of attempted voluntary manslaughter. See State v. Mark Steven Treuchet, No. E2019-00663-CCA-R3-CD, 2020 WL 4346756, at *18 (Tenn. Crim App. July 29, 2020).[5] However, if the jury considered voluntary manslaughter, it was responsible for reviewing the evidence to ascertain whether it supported a finding of adequate provocation, and this court will not disturb its determination on appeal. See State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001).

We conclude that the evidence is sufficient to support the jury's verdict of an attempted knowing killing. Viewed in the light most favorable to the State, the proof at trial showed that the victim and Ms. Burnett took a weekend trip to New York together. The Defendant, who had been checking Ms. Burnett's Facebook page while she was gone, procured the handgun from Ms. Burnett's storage locker before she and the victim returned from New York. Rebecca warned the Defendant that the couple would return to the townhouse that evening, yet the armed Defendant chose to remain. The Defendant's vehicle was parked out of sight from the townhouse. Investigator Terry noticed gaps in the blinds of the window that overlooked the driveway of the townhome. Detective Lori Gross said that the blinds on the window facing the driveway appeared as if someone was holding them apart and looking out through them. In addition, Ms. Burnett estimated that she had been in the house for only about thirty seconds and was eight feet inside of the house when the Defendant started shooting at the unarmed victim from the second-floor landing. The Defendant emptied his weapon, firing seven shots at the victim, and hitting him five times. Ms. Lokey and Mr. Farmer, after hearing the gunshots, went to the townhouse. Ms. Lokey heard a female voice say, "You are not supposed to be here." Mr. Farmer saw Ms. Burnett outside, while the victim was lying "in front of the doorway" with "his legs sort of hanging out in the walkway." Mr. Farmer also heard Ms. Burnett ask, "'Why would you do that,' in reference to the shooting." After the shooting, the Defendant remained on the stairs and did not attempt to aid the victim.

---

[5] This court's recent opinion in State v. Brandon Scott Donaldson, No. E2020-01561-CCA-R3-CD, 2022 WL 1183466, at *21-24 (Tenn. Crim. App. Apr. 21, 2022), makes pertinent observations that are certainly worthy of discussion. However, this court has repeatedly recognized that state of passion produced by adequate provocation cannot be treated as a partial defense to second degree murder unless and until such treatment is expressly authorized by the Tennessee Supreme Court or the legislature. See State v. William Langston, No. W2015-02359-CCA-R3-CD, 2017 WL 1968827, at *13 (Tenn. Crim. App. May 12, 2017), perm. app. denied (Tenn. Sept. 22, 2017) (collecting cases).

*II. Dr. Montgomery's Testimony*

A. <u>Underlying Data</u>. Next, the Defendant argues that the trial court erred by prohibiting Dr. Montgomery from testifying about the reasoning and science upon which he based his opinion of the Defendant's mental condition at the time of the shooting. According to the Defendant, the trial court's ruling allowed the State to inaccurately portray Dr. Montgomery as an unreliable expert witness whose opinions were based on false or inaccurate information. The State responds that the trial court did not abuse its discretion by so limiting Dr. Montgomery's testimony.

Specifically, the Defendant submits that Dr. Montgomery's testimony about the Defendant's statements during the forensic interview was not relaying inadmissible hearsay because the statements were not offered for the truth of the matters asserted, instead, their being offered to show how Dr. Montgomery arrived at his diagnosis of PTSD and how the Defendant's statements were consistent with that diagnosis. According to the Defendant, because these statements were not hearsay, and because they were not "[f]acts or data that [were] otherwise inadmissible," they were not excluded by Tennessee Rule of Evidence 703. He also submits that merely because they were "self-serving," did not make them inadmissible.

Alternatively, the Defendant argues that even if his statements and the testimony proffered by Dr. Montgomery in his affidavit constituted "facts or data that [were] otherwise inadmissible," the trial court made no finding that their probative value substantially outweighed their prejudicial effect, as required by Rule 703; a balancing test that, in the Defendant's opinion, weighs in his favor given that his mental state at the time of the shooting was a paramount issue at trial. Finally, the Defendant contends that the trial court should have allowed Dr. Montgomery to testify about the matters at issue accompanied by a limiting instruction.

The Defendant concludes that the trial court's error was not harmless. The Defendant asserts that Dr. Montgomery's testimony was relevant to whether the Defendant could have honestly and reasonably believed he was in imminent real danger of death or serious bodily injury, thus, supporting self-defense; and whether the Defendant could have been in a state of passion produced by reasonable provocation, thus, supporting attempted voluntary manslaughter.

Tennessee Rule of Evidence 703 provides that an expert may base an opinion upon inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in that situation. See <u>State v. David Lynn Jordan</u>, No. W2007-01272-CCA-R3-DD, 2009 WL 1607902, at *24 (Tenn. Crim. App. June 9, 2009); <u>State v. Marlow Williams</u>, No. W2005-02803-CCA-R3-CD, 2007 WL 2781720, at *7 (Tenn. Crim. App. Sept. 25, 2007). <u>See also</u> <u>United States v. Locascio</u>, 6 F.3d 924, 938 (2d Cir. 1993) (explaining that

"expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions"); United States v. Daly, 842 F.2d 1380, 1387-88 (2d Cir. 1988) (concluding same). The Advisory Committee Comment to Rule 703 provides: "If the bases of expert testimony are not independently admissible, the trial judge should either prohibit the jury from hearing the foundation testimony or should deliver a cautionary instruction."

Dr. Montgomery stated in his affidavit that the materials upon which he relied, including the Defendant's statements, were the type that experts in his field typically used in reaching their opinions. Knowledge of these statements would have assisted the jury with evaluating Dr. Montgomery's testimony regarding the Defendant's mental state at the time of the shooting, and there was nothing inherently prejudicial about the nature of the statements. See Tenn. R. Evid. 703. We are constrained to agree with the Defendant that the trial court should have allowed Dr. Montgomery to testify about the statements the Defendant made to him during the forensic interview. Moreover, the State was permitted to inquire on cross-examination of Dr. Montgomery about the inconsistencies in the Defendant's statements to VA personnel, and the trial court should have issued a limiting instruction on how to consider that evidence. See Jordan, 2009 WL 1607902, at *24 (observing "that the better practice would have been for the lower court to give a jury instruction that these statements should be used solely to understand and assess the expert's testimony").

Relative to the Defendant's limiting instruction allegation, the State argues that the issue is waived due to the Defendant's failure to request such an instruction at trial. However, the Defendant clearly requested an instruction during its redirect of Dr. Montgomery, asking the trial court to instruct the jury that it should consider statements attributed to the Defendant for the limited purpose of impeaching Dr. Montgomery's opinion and that it did not impeach the Defendant. Moreover, there is a written request from the Defendant for a special jury instruction in the technical record. The instruction asks the trial court to instruct the jury that the Defendant's statements in his medical records, as referenced by Dr. Montgomery, "are only relevant with regard to the validity of Dr. Montgomery's opinion" and "they are not to be considered with regard to [the Defendant's] credibility."

What is most problematic, however, is that both parties fail to observe that the trial court did, in fact, issue the instruction requested by the Defendant in its final charge to the jury. Specifically, the trial court charged as follows:

> During the testimony of Dr. Montgomery, the State mentioned . . . several statements attributed to the [D]efendant that were contained in the medical records. The statements are only relevant with regard to the validity

-30-

of Dr. Montgomery's opinion. They may not be considered by you in assessing the credibility of the [D]efendant's testimony at trial.

Thus, the issue is not waived as the State asserts, and there is no error by the trial court in failing to give the instruction as the Defendant asserts. We are truly at a loss as to why this has been overlooked by the attorneys for both sides. The Defendant's limiting instruction allegation is moot.

Nonetheless, the question then becomes whether the trial court's failure to allow the Defendant to ask about the statements more in depth was harmless error. See Jordan, 2009 WL 1607902, at *24. The Tennessee Rules of Appellate Procedure provide for harmless error review. See Tenn. R. App. P. 36(b). However, "[a]ll errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). This analysis "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." Rodriguez, 254 S.W.3d at 372 (citations omitted).

First, we note that as for the exclusion of Dr. Montgomery's testimony relating to his consideration of additional sources besides the forensic interview in formulating his PTSD diagnosis—the 911 call, the VA records, and observations of witnesses after the shooting, the State never objected to any questions posed to Dr. Montgomery relative to these sources. Because there was no specific limitation on questioning as it pertained to these sources, there was no error by the trial court. Likewise, the Defendant did not mention these additional sources in his motion for a mistrial that immediately followed Dr. Montgomery's testimony.

Relative to the Defendant's statements in the forensic interview, the Defendant, as the State points out, does not reference any specific statement that the Defendant made or how its exclusion was prejudicial; instead, the Defendant makes the blanket assertion that exclusion of all of his statements was error. The Defendant does in a footnote point to pages in Dr. Montgomery's report that were entered as an exhibit to the sentencing hearing. However, the report cites to multiple statements by the Defendant, spanning several pages. We decline to analyze each individual statement for its prejudicial effect without some further guidance from the Defendant. When issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, we will not engage in an exhaustive review of the merits thereof. See Tenn. R. App. P. 27(a), Tenn. Crim. App. R. 10(b).

-31-

First, though the defense's questioning of Dr. Montgomery was improperly limited, importantly, the limiting instruction was actually given. Moreover, Dr. Montgomery, on direct examination, testified that the information he received from the various sources informed his PTSD diagnosis—those being Dr. Montgomery's forensic interview with the Defendant, the Defendant's 911 call, the Defendant's VA medical records, and statements from witnesses describing the Defendant's behavior after the shooting. In addition, the Defendant himself testified at trial. Moreover, the jury was independently presented with the much of the evidence that informed Dr. Montgomery's opinion.

On redirect, defense counsel presented Dr. Montgomery with specific instances that occurred on cross-examination and Dr. Montgomery was permitted to explain further— like the Defendant's failure to report his mental health history earlier and the various ways the Defendant described the August 14, 2016 events to VA personnel. In fact, Dr. Montgomery opined that the Defendant's inaccurate memory of the trauma was consistent with the PTSD diagnosis. Dr. Montgomery also testified about how his interview with the Defendant led him to diagnose the Defendant with PTSD and to conclude that the Defendant was not malingering in his symptoms. Dr. Montgomery explained that the "older trauma" did not come out during the interview until he "pointedly ask[ed]" the Defendant about it. According to Dr. Montgomery, when the Defendant did eventually start talking about it, he was shaking and crying and had to take some medication that he had brought with him. Dr. Montgomery also opined that the Defendant's demeanor on the 911 call, his being distraught and fearful, was consistent with his diagnosis.

Despite the error, the jury accredited Dr. Montgomery's testimony regarding the Defendant's ability to premediate, acquitting the Defendant of the attempted first-degree murder charge. Moreover, relative to self-defense, Dr. Montgomery was permitted to testify that the recording of the 911 call indicated that the Defendant was in a highly emotionally charged state, that the Defendant's PTSD made him more likely to feel threatened when the victim entered the townhouse, and that it would take a person with PTSD longer to figure out that he was not actually facing a threat. According to Dr. Montgomery, due to the Defendant's PTSD, the Defendant's fear and perception of threat was heightened and distorted, and he would have a greater propensity to feel threatened by the circumstances he encountered, as well as his staying in a panicked and agitated state for longer than usual. The jury received this testimony but rejected Dr. Montgomery's opinion as it pertained to self-defense, as was it prerogative. We conclude that the Defendant has failed to show that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial or resulted in prejudice to the judicial process. See Jordan, 2009 WL 1607902, at *25.

B. Improper Comments. The Defendant contends that the trial court erred in denying his motion for a mistrial after the trial court improperly commented on Dr.

Montgomery's credibility in two separate incidents. Specifically, the Defendant references the following: (1) on cross-examination by the prosecutor, that defense counsel could "clean . . . up" Dr. Montgomery's testimony on redirect examination; and (2) on redirect examination, that defense counsel needed to be specific about how he sought to "rehabilitate" Dr. Montgomery. According to the Defendant, these comments by the trial court amounted to improper judicial comments on the credibility of a witness in violation of Article VI, section 9 of the Tennessee Constitution.[6]

The State first responds that the Defendant has waived plenary review of the trial court's "clean things up" comment because the Defendant did not raise a contemporaneous objection or reference that specific comment in his motion for new trial. Waiver is supported by the record as the Defendant did not raise a contemporaneous objection during trial, include the issue in his subsequent motion for a mistrial, or raise the issue in his motion for new trial. See Tenn. R. App. P. 3(e), 36(a). Accordingly, this issue is reviewable for plain error only. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); see also State v. Reynolds, 635 S.W.3d 893, 931 (Tenn. 2021).

The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v.

---

[6] Though the Defendant also submits that the trial court's comments abridged his rights to a fair trial and due process of law under Article I, section 8 of the Tennessee Constitution and the Fifth and Fourteenth Amendments to the United States Constitution, he does not adequately brief issue, never referencing the language of any of these other constitutional provisions, providing any argument regarding the application of these constitutional provisions to the facts, nor any citations to authority in support of this additional argument. Accordingly, this portion of the Defendant's issue is waived. See Tenn. R. App. P. 27(a), Tenn. Crim. App. R. 10(b).

Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)).

According to the Defendant, the trial court's comments left the jury "with the impression that the trial court believed that the prosecutor had so successfully impugned Dr. Montgomery's credibility on cross-examination that defense counsel would need to restore the witness's reputation and believability on redirect." The Defendant continued, "The trial court's comments suggested that Dr. Montgomery's testimony on direct examination was less credible after being subjected to cross-examination." The State responds that the trial court did not improperly comment on Dr. Montgomery's credibility and that the trial court properly denied the Defendant's motion for a mistrial.

The decision to grant or deny a mistrial rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Robinson, 146 S.W.3d at 494 (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

In Tennessee, judges are constitutionally prohibited from commenting upon the credibility of witnesses or the evidence in a case. See Tenn. Const. art. VI, § 9 (providing that "judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"). "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989). These restrictions apply to comments made when ruling on an objection. Loeffler v. Kjellgren, 884 S.W.2d 463, 474 (Tenn. Ct. App. 1994). Any comments on the weight of the evidence by the trial judge is an invasion of the province of the jury. Bolin v. State, 405 S.W.2d 768, 773 (1966). However, "not every comment on the evidence made by a judge is grounds for a new trial." Mercer v. Vanderbilt Univ., Inc., 134 S.W.3d 121, 134 (Tenn. 2004). The trial court's comments must be considered in the overall context of the case to determine whether they were prejudicial. Id. (citing State v. Caughron, 855 S.W.2d 526, 536-37 (Tenn. 1993)).

In the case herein, it is apparent from the exchange above that the trial court's statement during the prosecutor's cross-examination that defense counsel could "clean things up on redirect" was not a comment on Dr. Montgomery's credibility but was merely

a response to defense counsel's request that Dr. Montgomery be allowed to expand his answer. It was clear from the transcript that the defense and Dr. Montgomery wanted Dr. Montgomery to expand upon his answers. The trial court's response to defense counsel's request was merely an acknowledgment that the defense would be permitted to ask clarifying questions on redirect examination and that Dr. Montgomery would then be given the opportunity to explain his answers further.

Relative to the trial court's comment on redirect examination asking defense counsel to restate his question and to be specific about what portion of Dr. Montgomery's testimony that he intended to "rehabilitate," it was merely the trial court's attempt to curtail open-ended questioning and a request of defense counsel to be specific about the area of testimony in which he wanted to rehabilitate Dr. Montgomery. Defense counsel's question indicated that he wished to revisit a portion of Dr. Montgomery's testimony on cross-examination to allow further explanation, but the question was broad and non-specific. In our view, the trial court's statements were not commenting on the weight or credibility of Dr. Montgomery's testimony but were merely attempts to maintain legal protocols and explain courtroom procedure.

Furthermore, in denying the motion for a mistrial, the trial court stated that it would instruct the jury about what it could consider in reaching a verdict and that the trial court had not drawn any conclusion by its words or actions as to how the jury should rule. During the jury charge, the trial court instructed the jury that the court "[a]t times during the trial" had "ruled upon the admissibility of evidence" and that the jury was "not concern [it]self with these rulings." The trial court continued, "Neither by such rulings, these instructions, nor any other remarks which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." Later, the trial court instructed the jury, "You are the exclusive judges of the credibility of a witness[.]" The trial court's instructions clearly indicated to the jury that it was not to construe any remarks of the trial court as an indication of how it should interpret the facts or rule on the case, as well as informing the jury that they were the exclusive judges of credibility.

The jury was presumed to follow the court's instructions. State v. Rimmer, 623 S.W.3d 235, 263 (Tenn. 2021). Thus, even if the trial court's comments were in error, the Defendant has not established prejudice from the trial court's comments. See State v. Adkins, 653 S.W.2d 708, 714 (Tenn. 1983) (finding no error or prejudice where the trial judge characterized a witness as hostile and later instructed the jury correctly respecting hostile witnesses); see also State v. Hester, 324 S.W.3d 1, 89 (appendix) (Tenn. 2010) (holding that the trial court's explanatory remarks as to why it directed that certain exhibits be moved immediately from the area was not an improper comment on the evidence); Torrence v. Kusminsky, 408 S.E.2d 684, 693 (W. Va. 1991) (finding no prejudice to a jury in a medical malpractice case in which the trial court "reminded counsel that he would

-35-

'have an opportunity to redirect or rehabilitate' the doctor"); State v. Terry Lee Sanderson, No. 85-89-III, 1986 WL 651, at *8-9 (Tenn. Crim. App. Jan. 7, 1986) (determining no prejudice from the trial court's characterization of the evidence about livor mortis as non-medical). The Defendant is not entitled to plain error relief.

## *III. Sentencing*

The Defendant argues that the trial court erred in imposing the maximum sentence allowable by law and, further, that it erred in imposing a sentence of continuous confinement. According to the Defendant, the trial court erred in applying three statutory enhancement factors and should have applied five statutory mitigating factors. The Defendant asks this court to reduce his sentence to ten years and to impose a sentence of probation. The State responds that the trial court did not abuse its discretion in sentencing the Defendant.

When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section

40- 35-103(5); Carter, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

Here, the Defendant was convicted of attempted second-degree murder, a Class B felony. See Tenn. Code Ann. §§ 39-12-107(a), -13-210(c)(1). The Defendant was classified as a Range I, standard offender, and his sentencing range was between eight to twelve years. See Tenn. Code Ann. § 40-35-11(a)(2).

At the outset of the sentencing hearing, the trial court indicated that it had considered the purposes and principles of the Sentencing Act in determining the appropriate sentence. The trial court then found that the following enhancement factors applied: (1) the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (5) the defendant treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense; (6) the personal injuries inflicted upon the victim were particularly great; (9) the defendant possessed or employed a firearm during the commission of the offense; and (10) the defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(1), (5), (6), (9), (10).

In applying enhancement factor (1)—the Defendant had a previous history of criminal convictions or criminal behavior, the trial court noted that the Defendant had a 2009 misdemeanor conviction in Illinois for violating an order of protection, that the Defendant had been placed on probation in Davidson County in 2014 for misdemeanor convictions of domestic assault and harassment, and that the Defendant had been convicted of reckless driving and two driver's license violations in Sumner County. The trial court acknowledged that the Defendant's criminal history consisted of misdemeanor offenses, but the court found that "it suggest[ed] a pattern of conduct in the domestic context, which [was] especially notable given the circumstances of this case."

Next, the trial court determined that factor (6) applied—the personal injuries inflicted upon the victim were particularly great.[7] Relative to this factor, the trial court noted that the victim had testified at the sentencing hearing and that he had described his injuries he sustained as a result of the shooting. The trial court recounted that the Defendant shot the victim five times, which damaged the victim's spine, lung, bowel, and ribs, as well as just missing his aorta; that the victim was permanently paralyzed and disabled and required the use of a catheter; that the victim's immune system was now compromised; that the victim had undergone lengthy and extensive medical treatments after the shooting,

---

[7] We will recount the trial court's application of certain factors in the order they were discussed, though they do not follow numerically.

including fifty-days in the hospital and another sixty-five days in rehabilitative services, as well as suffering from a staph infection and bedsores; that the victim suffered significant financial loss, as well as psychological damage that still required medicine for anxiety; and that the victim's ability to participate in his son's life was adversely impacted. In sum, the trial court determined that "the quality and experience of the victim's life ha[d] been permanently altered by the actions of the Defendant" and accorded the factor "great weight."

Thereafter, the trial court applied factor (9)—the Defendant possessed or employed a firearm during the commission of the attempted second-degree murder. The trial court noted that this enhancement factor was not an element of the offense of attempted second-degree murder.

The trial court then discussed factor (5)—the Defendant treated the victim with exceptional cruelty during the commission of the offense. Relative to this factor, the trial court concluded that "[t]he circumstances of the offense were especially shocking, and the cruelty evidenced by the Defendant's actions went over and above that inherent in the crime of attempted second-degree murder." The court mentioned that the Defendant "employed a firearm against the victim . . . in such a manner as to inflict maximum harm behind cover from the high ground and to the fullest effect"; that he "emptied a loaded weapon into an unarmed and unsuspecting victim, hitting him five times and inflicting exceptional physical damage"; and that after the shooting, the Defendant "watched from a distance as the victim laid near death from his wounds, rendering no aid, although [the Defendant] was in a position to do so." The trial court noted that the Defendant had been found liable in a civil proceeding for intending to cause the victim to suffer serious bodily injury.

Lastly, the trial court applied factor (10)—the Defendant had no hesitation about committing a crime when the risk to human life was high. The trial court found that the shooting occurred inside the townhouse while, in addition to the victim, Ms. Burnett was present and could have been seriously injured.

The trial court then considered the mitigating evidence. The factors proposed by the Defendant were as follows: (2) the defendant acted under strong provocation; (3) grounds exist tending to excuse or justify the defendant's conduct, though failing to establish a defense; (8) the defendant was suffering from a mental condition that significantly reduced his culpability for the offense; (11) the defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and (13) any other factor consistent with the purposes of this chapter, known as the "catch-all" mitigating factor. See Tenn. Code Ann. § 40-35-113 (2), (3), (8), (11), (13).

Relative to mitigating factors (2) and (3), the trial court determined that there was no provocation or other reasonable ground to justify the Defendant's actions. The trial court commented that the Defendant was staying at the townhouse while the victim and Ms. Burnett were in New York City; that the Defendant received notice that the victim and Ms. Burnett were returning to the townhouse from their trip; that despite his receiving that information, he had armed himself and chose to stay at the townhouse; and that arming himself "required added effort that was necessary to retrieve a weapon from a separate storage unit." The trial court continued, remarking that as soon as the victim entered the townhouse, the Defendant "fired down upon" the victim from the second-floor landing and that the victim was unarmed and unaware that the Defendant was inside the townhouse because the Defendant had parked his vehicle away from the residence, presumably in an effort to avoid detection. The trial court stated that "[t]he greatest tragedy of this case [was] that it could so easily have been avoided." The trial court observed that though all of the parties had "behaved badly" in the months leading up to the shooting, none of that behavior justified the Defendant's actions or mitigated his penalty.

The trial court next addressed factor (11)—the Defendant committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated the criminal conduct. The trial court rejected its application, finding that "[t]he circumstances of this offense were not unusual," but "[r]ather, . . . involved, sadly all too common, issues of marital infidelity, manipulation and jealousy."

Thereafter, the trial court declined to apply mitigating factor (8)—the Defendant was suffering from a mental condition that significantly reduced his culpability for the offense. In rejecting this factor, the trial court reasoned, "The forensic psychiatric report prepared by Dr. Stephen Montgomery, while presuming that the Defendant lacked the capacity for premeditation at the time of the crime due to post-traumatic stress disorder, also relayed details about the Defendant's actions leading up to the offense that casts significant doubt on that conclusion." The trial court further commented that it was "notable that the jury also rejected it as a basis for a defense."

Finally, addressing the catch-all mitigating factor (13), the trial court observed that the Defendant's military service was commendable, his having served in the Marine Corps. The trial court also mentioned that the Defendant had presented evidence of his social history at the hearing, including the Defendant's friends and family testifying about his background and expressing their support, as well as their devotion to the Defendant being evident. In addition, the trial court observed that the Defendant had presented evidence about his mental condition, especially his diagnosis of PTSD and depression.

In conclusion, the trial court commented that the offense was serious and the consequences were grave and that the sentence imposed should be in relation to the seriousness of the offense. The trial court then imposed the maximum sentence of twelve

years' incarceration, reasoning, "Weighing all the statutory factors and considering the statutory sentencing principles, the [c]ourt concludes that the applicable enhancement factors in this case far outweigh any mitigation."

On appeal, the Defendant contends that the trial court erred in finding that he had "a previous history of criminal convictions or criminal behavior" under factor (1) because he had no prior felony convictions. However, a trial court may apply this factor based solely on a prior history of misdemeanor convictions. See State v. Ramsey, 903 S.W.2d 709, 714 (Tenn. Crim. App. 1995); see also State v. Ron "Cotton" Seals, No. E2008-02178-CCA-R3-CD, 2010 WL 3384978, at *6 (Tenn. Crim. App. Aug. 27, 2010). In addition, the trial court noted the Defendant's criminal history suggested "a pattern of conduct in the domestic context." We cannot say that the trial court abused its discretion by applying this factor.

Next, the Defendant argues that the trial court erred in finding that he treated the victim with "exceptional cruelty" under factor (5) based upon its finding that the Defendant shot the victim five times and the Defendant's failure to render aid to the victim. According to the Defendant, this factor is usually applied in cases of torture, and no evidence of such exists in this case. The Defendant cites to multiple cases from this court and submits that this court has held that multiple gunshot or stab wounds do not, by themselves, support a finding that he treated the victim with exceptional cruelty. The Defendant continues that as to the trial court's finding that he failed to render aid to the victim, he was in contact with the 911 operator before, during, and after the shooting. The Defendant observes that Mr. Farmer had already begun rendering medical aid, so there was little else he could have done.

Evidence supporting the application of the exceptional cruelty enhancement factor requires a finding of cruelty "over and above" what is required for the offense itself. Arnett, 49 S.W.3d at 258 (quoting State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). In other words, "'[e]xceptional cruelty,' when used as an enhancement factor, denotes the infliction of pain or suffering for its own sake or from gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." State v. Reid, 91 S.W.3d 247, 311 (Tenn. 2002). Whether a defendant treats a victim with exceptional cruelty is "a matter of degree." State v. Terrance Maurice Moore, No. 02C01-9306-CC-00126, 1994 WL 245481, at *2 (Tenn. Crim. App. June 8, 1994). This factor is most often found in cases of abuse or torture, but it has been found applicable in cases where traumatic and severe injuries were sustained by the victim. State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). When applying this factor, a trial court should articulate the actions of the defendant, apart from the elements of the offense, which constitute exceptional cruelty. State v. Goodwin, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995).

Here, the trial court in applying this factor remarked that "[t]he circumstances of the offense were especially shocking" because the Defendant shot the victim five times "in such a manner as to inflict maximum harm" and "exceptional physical damage." The trial court had previously recounted in detail the traumatic and severe injuries suffered by the victim. The trial court noted that the Defendant failed to render aid, though he was in a position to do so. We cannot say that trial court erred in applying this factor given the extensive nature of the victim's injuries. See Gray, 960 S.W.2d at 611 (applying factor (5) in a second-degree murder case where the facts showed that the defendant's fiancée/victim had "many external injuries including a laceration on her scalp, abrasions above her right eye, on her back and right side, on her hip bone and on her thighs, bruises on her breasts, and marks on her forearms and wrists," as well as the victim's sustaining a fractured skull and several internal injuries); State v. David Joseph Buckhanon, No. M2011-00619-CCA-R3-CD, 2012 WL 5989858, at *10 (Tenn. Crim. App. Nov. 28, 2012) (applying factor (5) when the defendant shot the victim at close range with a shotgun, causing permanent blindness, and left the victim for dead).

The Defendant also submits that the trial court should not have found that he "had no hesitation about committing a crime when the risk to human life was high" under factor (10). According to the Defendant, the evidence does not demonstrate that his actions in shooting the victim created a high risk to Ms. Burnett's life, and this court has rejected the argument that the mere presence of another person in a room where a shot was fired necessarily indicates that the risk to that person's life was high.

Even when factor (10) is an element of the offense, it may still be applied where the defendant creates a high risk to the life of a person other than the victim. State v. Trent, 533 S.W.3d 282, 298 (Tenn. 2017). At trial, the victim testified that he and Ms. Burnett were "[a]pproximately one foot" apart and "almost touching each other" at that time he was first shot. Ms. Burnett indicated that she had been in the house for only about thirty seconds and was eight feet inside of the house when the Defendant started shooting. Based on Ms. Burnett's proximity to the victim, she certainly could have been seriously injured, as the trial court found. We again cannot say that the trial court abused its discretion by applying this factor based upon the high potential for injury to Ms. Burnett. See State v. Reginold C. Steed, No. M2016-01405-CCA-R3-CD, 2017 WL 1830105, at *9 (Tenn. Crim. App. May 5, 2017) (concluding that application of this enhancement factor was not an abuse of discretion when "there was a risk of the lives of others who were present in the area when the [d]efendant began shooting"); State v. Johnathan Everett, No. W2008-01578-CCA-R3-CD, 2011 WL 1304893, at *11 (Tenn. Crim. App. Apr. 4, 2011) (finding that this factor was properly applied where the defendant fired a weapon in a crowded area outside a high school where there were numerous other people in the parking lot of an apartment complex).

Relative to mitigating factors, the Defendant argues that the trial court erred in rejecting factors (2)—that the Defendant acted under strong provocation—and (3)—that substantial grounds existed tending to excuse or justify the Defendant's conduct, though failing to establish a defense. The Defendant again argues that the evidence supports a conviction for attempted voluntary manslaughter. He further submits that the jury's rejection of his self-defense claim did not preclude mitigation, where, as here, the victim repeatedly threatened to kill the Defendant prior to the incident, the Defendant was aware of these threats, and the Defendant shot the victim only after the victim had entered the townhouse.

The Defendant's argument relies on his account of the shooting and the preceding events. However, the record supports the trial court's finding that "[t]here was no provocation or other reasonable ground to justify the Defendant's actions on the evening of" the shooting. The trial court's observations are pertinent: the Defendant stayed in the townhouse while the victim and Ms. Burnett were in New York City; even upon the Defendant's receiving notification of the couple's imminent return, he stayed in the townhouse; as soon as the unarmed victim entered the townhouse, the Defendant shot him five times from an elevated position; the Defendant had to take steps to arm himself by retrieving the weapon from the storage locker before they returned; and the Defendant tried to conceal his presence by parking his vehicle away from the townhome. In accordance with its findings, the trial court properly exercised its discretion by rejecting these factors.

Next, the Defendant argues that the trial court erred in declining to find that he was suffering from a mental condition that significantly reduced his culpability for the offense under factor (8). The Defendant notes that he presented testimony from Dr. Montgomery that due to his PTSD, he was not sufficiently free of excitement and passion as to be capable of exercising reflection and judgment prior to acting. The Defendant continues that the jury, by acquitting him of the charged offense of attempted first-degree murder, accredited Dr. Montgomery's testimony that he was not capable of acting with premeditation at the time of the shooting due to his severe mental illness.

The trial court found that Dr. Montgomery's report "relayed details about the Defendant's actions leading up to the offense that cast[ed] significant doubt" on Dr. Montgomery's conclusion that the Defendant lacked the capacity for premeditation due to PTSD. The State's cross-examination of Dr. Montgomery revealed that the Defendant provided multiple different accounts of the shooting to various individuals and that the Defendant's version of the shooting was not supported by the proof. When the Defendant initially visited the VA in October 2016, he denied a history of previous traumatic events and indicated that he was not exposed to combat during his military service; however, by 2018, he reported that he had experienced combat trauma. Furthermore, as noted by the trial court, while the jury acquitted the Defendant of attempted first-degree murder,

presumably based upon Dr. Montgomery's testimony regarding the effects of the Defendant's PTSD on his ability to premeditate, the jury did not find that the Defendant acted in self-defense with regard to attempted second-degree murder. Accordingly, we cannot say that the trial court abused its discretion by rejecting as a mitigating factor that the Defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offense.

The Defendant also contends that he committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated his criminal conduct under factor (11), and therefore, the trial court erred by declining to apply this factor. According to the Defendant, "[t]he circumstances of the shooting were clearly unusual."

Contrary to the Defendant's assertion, the circumstances of the shooting were not unusual. As noted by the trial court, this case "involved, sadly all too common, issues of marital infidelity, manipulation and jealousy," and simply because all parties behaved badly in the months leading up to the shooting, this did not justify the Defendant's actions. The Defendant armed himself, returned to the townhouse, hid his car, and lain in wait until the couple's return. The trial court did not abuse its discretion by declining to apply this factor.

Finally, the Defendant submits that the trial court should have recognized his military service and honorable discharge as a statutory mitigating factor under the catch-all provision of factor (13). However, the trial court did consider the Defendant's military career, social history, and mental condition under this factor. The Defendant's argument goes merely to the weight the trial court afforded it. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Carter, 25 S.W.3d at 344.

To summarize, we have determined that the trial court did not abuse its discretion in the application of factors (1), (5), and (10). The Defendant does not challenge the trial court's application of factors (6) and (9). In addition, the Defendant's arguments relative to mitigating factors are without merit. Moreover, even if the trial court erred in its application of an enhancement or mitigating factor, such an error does not automatically entitle the Defendant to relief. "[T]he misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. Here, the trial court considered the purposes and principles of the Sentencing Act and imposed a within-range sentence. The Defendant's sentence length of twelve years is affirmed.

The Defendant also argues that the trial court erred in imposing a sentence of continuous confinement. The Defendant initially acknowledges that his sentence of twelve

years for attempted second-degree murder makes him ineligible for probation. <u>See</u> Tenn. Code Ann. § 40-35-303(a) (providing that a defendant is eligible for probation if the sentence actually imposed is ten years or less). Because we have affirmed the sentence length of twelve years, and declined the Defendant's request to reduce his sentence to ten years, he still remains ineligible for probation.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
D. KELLY THOMAS, JR., JUDGE